## IRVING TRUST CO. v. TOWNSEND et al.

District Court, S. D. New York.
July 5, 1922.

Charles Dickerman Williams, of New York City, for plaintiff.

Maass & Davidson, of New York City, for defendant Townsend.

Bonynge & Barker, of New York City (Robert J. Sykes, of New York City, of counsel), for defendant Whist.

PATTERSON, District Judge.

This is a suit in equity by the trustee of W. W. Townsend & Co., Inc., to recover a transfer of $5,000 alleged to have been made in fraud of creditors. The case was referred to a special master, who has made findings and conclusions favorable to the defendants.

The events which led to the making of a certain written agreement of August 24, 1929, are not disputed. The bankrupt corporation was engaged in the sale of corporate securities. The defendant Townsend was the president and a large stockholder. In the spring of 1929 the defendant Whist, whose headquarters were in Paris, laid before the bankrupt's officers the idea of promoting a new company which would acquire and hold a controlling stock interest in several foreign insurance companies, among them a Swedish Company known as Malaren Insurance Company. It seems that Whist had already obtained options on the stocks of the companies. The bankrupt's officers and directors were favorably impressed, and plans were made to organize the holding company, to be called Domestic & Foreign Insuranstocks Corporation, and to offer its stock to the public. The time came when those in charge of the bankrupt's affairs felt

that more precise information about the foreign companies was needed before the making of any definite commitments. Townsend accordingly left for Europe to investigate; he expected also to arrange an extension of options on certain of the stocks. He had no express authority to make contracts to purchase any of the stocks. Down to this point there is not the slightest doubt that the enterprise was one in which the bankrupt corporation was interested as a promoter and that Townsend as an individual had no interest in it.

In an effort to obtain an extension of the option on the Malaren stock, Townsend and Whist had a meeting in Norway with one Hirsch, who either owned the stock himself or represented the stockholders. They found Hirsch not averse to an extension of time within which to pay for the stock, but adamant upon a definite commitment to buy as opposed to a mere option, and adamant also upon a personal obligation on the part of Townsend as distinguished from a corporate obligation of the bankrupt. This ultimatum did not come to them wholly as a surprise; a letter from Whist to Townsend and a cable from Townsend to his associates in New York prior to the conference show that both had an inkling of what the position of Hirsch would probably be. Faced with the alternative of the withdrawal of the Malaren shares from the deal, Townsend yielded on both points insisted upon by Hirsch and signed the following agreement:

"Oslo, Aug. 24, 1929

"Gunnar Hirsch, Esq.,
"Forsakringsaktiebolaget Malaren,
"Stockholm.

"Dear Sir:

"I hereby beg to confirm the agreement concluded by Mr. Alf Whist and by telegrams exchanged between my firm in New York and Aktiebolaget Svenska Hendelsbanken in Stockholm to the effect that I have purchased from you not less than 51% or not more than 75% of the Forsakringsaktiebolaget Malaren's 3.000 shares at a rate of 120%, i. e. 600:—Swedish kroner a share plus 6% interest thereon from 1st of August 1929 until payment is made. As purchaser I shall be entitled to select in my place another person or a certain company. (This will in all probability be the Domestic & Foreign Insurancestocks Corporation of New York). Payment of the number of shares that has now been deposited by you in Aktiebolaget Svenska Handelsbanken in Stockholm comprising 71.96%, corresponding to

2.159 shares, i. e., Swedish kroner 1.295.000: —plus 6% interest as above, shall be made at Aktiebolaget Svenska Handelsbanken in Stockholm, Drottninggatan 5, not later than November 15, 1929. I am under obligation until November 15, 1929, to take over further 3.04% of the Forsakringsaktiebolaget Malaren's shares corresponding to 91 shares i. e. Swedish kroner 54.600:—plus 6% interest as above, which amount is to be paid Aktiebolaget Svenska Handelsbanken in Stockholm either cash or by deposit under escrow agreement for successive delivery. Responsibility for stamp-duty shall be taken over by you.

"According to a previous agreement payment should have been made by me prior to 25th August 1929. This letter thus involves an amendment in regard to the date of payment in the earlier agreement, which later date is accepted by you.

"Yours truly, W. W. Townsend.

"The contents of the above are herewith accepted in every respect by the undersigned Mr. Gunnar Hirsch.

"Gunnar Hirsch."

In this letter the reference to confirming an agreement made by telegrams was an inaccuracy, as the telegrams had created nothing more than a revocable option. There had been no previous agreement, and the three persons present all knew it. Townsend was reluctant to sign this paper, involving as it did a definite commitment in an amount of about $375,000, but was persuaded to do so partly by Whist's undertaking that a French company controlled by him would take half of the responsibility. Accordingly it was declared in a writing made a day or two later between Townsend and Whist that each was acting in behalf of the company with which he was connected, and that the interest of each company in the Malaren matter should be one-half. Townsend reported the commitment to the other officers of the bankrupt as if it were a corporate obligation, and there is no question but that over the succeeding two months the obligation to purchase the Malaren stock was regarded by the bankrupt's officers as one made in the bankrupt's behalf and interest.

The plan of the new holding company met several setbacks in the ensuing months, but it was pursued until the financial crash late in October made consummation impossible. Hirsch was then advised that payment could not be made by November 15th. He threatened suit against Townsend and also against the bankrupt. It was finally ar-

839

ranged between Whist and Hirsch that upon payment of $10,000 by Whist, Townsend and the bankrupt would be released from all obligations regarding the Malaren shares and a new option running in favor of Whist would be given. Whist put up $5,000 from his own funds to make the necessary payment; the other $5,000 was paid out of the funds of the bankrupt. This $5,000 payment, the subject-matter of the present suit, was made on November 15, 1929, to one Van Iderstine, who was acting in Whist's behalf. Later on the money was sent to Whist's lawyer and was by him paid over to Hirsch, who gave a release in favor of Townsend. The bankrupt filed a voluntary petition on December 27, 1929.

The evidence as to the solvency of the bankrupt at the time of the payment is not all one way. I am convinced, despite the finding otherwise by the special master, that a condition of insolvency existed on November 15, 1929, and that Townsend was aware of it. As for Whist, the proof tends to show that he had no knowledge of such insolvency.

The trustee's contention is that the bankrupt's $5,000 was used to relieve its president, Townsend, from an obligation purely personal to him, arising out of the contract of August 24, 1929, and that the payment was therefore a diversion of corporate funds and a fraud upon the bankrupt's creditors. The first step in the argument is that under the contract of August 24, 1929, the party who contracted to purchase the Malaren stock was Townsend and not the bankrupt. This point is well taken. The plain meaning of the words used in the writing is that Townsend will buy the stock; and the circumstances surrounding the transaction, far from rebutting this conclusion, strongly reinforce it. Townsend was in a distant country on business of the corporation. He had no express authority from the corporation to make a commitment to buy the shares. Hirsch knew nothing directly of the corporation off in New York. Under the conditions, it was quite in order for Hirsch to take no chances upon the financial responsibility of the corporation or upon Townsend's authority to bind it, and to insist upon getting the personal obligation of Townsend himself. The proof shows that this was precisely the attitude taken by Hirsch, and that Townsend at all times appreciated that he was binding himself personally. The various letters and cablegrams exchanged by Townsend, Whist, and Hirsch show unmistakably that all of them treated the contract as one involving Townsend's personal responsibility. Townsend himself admitted as much when testifying in the bankruptcy proceeding. The situation was the not uncommon one where an agent negotiates with a third party, intending the deal to be one for his principal, but where the third party, doubtful as to the agent's authority or the principal's financial responsibility, prefers to have the personal responsibility of the agent. Despite the arguments of the defendants and the finding of the special master to the contrary, I see no possible escape from the conclusion that Townsend was personally bound by the written contract he had made with Hirsch and that the latter could have held him individually liable for nonperformance.

From the fact that Townsend had obligated himself personally to purchase the Malaren stock, it does not follow, however, that the bankrupt corporation had no interest or responsibility in the matter. It is abundantly clear that Townsend did not inject himself into the deal to make a profit or to gain any advantage for himself; he was forced by Hirsch to take on an undesired personal responsibility as the alternative of a collapse of the projected promotion. He regarded himself all along as holding the contract in trust for the benefit of the bankrupt, his principal, and he tendered to the bankrupt the supposed benefits of the transaction. The bankrupt accepted the situation and adopted the contract as its own. There can be no doubt that what transpired between August and November amounted to a ratification by the bankrupt. The proof is that Townsend reported the commitment promptly by letter to his co-officers and co-directors as a transaction made for the corporation, and that upon his return he discussed it orally with them. They accepted it as an accomplished fact, no suggestion of a repudiation being advanced at any time.

 It is probably true that Hirsch could not have prevailed in a suit directly against the corporation as Townsend's principal. The law seems to be that where a third party with full knowledge of the principal sees fit to extend credit exclusively to the agent, he cannot thereafter resort to the principal. In such a case the rule of undisclosed principal, permitting the third party to hold the agent or the undisclosed principal as he may elect, does not apply. Atlas S. S. Co. v. Colombian Land Co. (C. C. A.) 102 F. 358; Meeker v. Claghorn, 44 N. Y. 349. But the

fact remains that after ratification the bankrupt was bound to indemnify Townsend, its agent, against the consequences of his act in execution of his agency. Bibb v. Allen, 149 U. S. 481, 498, 13 S. Ct. 950, 37 L. Ed. 819. Upon being sued by Hirsch, Townsend could have vouched in the bankrupt, and between these two the party primarily liable was the bankrupt. The $5,000 payment from the bankrupt's funds, therefore, was made to relieve it not merely from an embarrassing situation but also from a legal liability. From what we know of the situation then confronting the parties, it would seem to have been a prudent settlement, made not only for the advantage of Townsend but also for the best interests of the bankrupt. There was consequently no fraudulent transfer. The payment was at most a preference—voidable, if at all, only against Hirsch. The transaction did not impose any liability upon Townsend or Whist.

The trustee makes the further argument that there was a fraudulent conveyance even if the bankrupt was under a liability as to the purchase of the stock. There is no merit in the point. The case bears no resemblance to Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419, and other authorities cited by the trustee, where transfers made by a debtor in an effort to raise funds wherewith to make a preference have been held to be fraudulent conveyances.

While I do not agree with the special master as to the legal effect of the written agreement or as to the financial condition of the bankrupt when the payment was made, I am in accord with him that the transfer was not a fraudulent diversion of the bankrupt's funds. There will be a decree dismissing the bill on the merits.